Call the first case for argument. 19-2867 from the Western District of Arkansas, J.B. Turner v. XTO Energy. Very well. I'd ask that all council mute microphones when not speaking. And we'll hear first from Mr. Brooks. Good afternoon. I'm Brian Brooks on behalf of appellate plaintiff J.B. Turner. I'm reserving, I'm going to try to reserve three minutes for rebuttal. I'll keep an eye on the clock. I've got it pinned up there. This is an oil and gas case. You, you may reserve, but the clock will continue to run until you stop your argument. That was my understanding, Your Honor. Thank you. Uh, this, this case arises from an oil and gas, a gas well in Franklin County, Arkansas. Mr. Turner owns or has an interest in a well, a different interest in a well that he holds in two different manners. The well has two zones in it, the viola zone and the hail zone, which you've all seen from our briefing. The hail zone is shallower than the viola zone. The hail zone is also known as the casing zone in the record. And the viola zone is known as the tubing zone because of what the gas pressure flows through. I'm not an oil and gas person, but, uh, but this is a basic contract case having to do with, with whether the terms of the contract were, were, were honored. Um, the rub of, of the case comes from whether the viola zone could produce gas after 1982 and Mr. Turner contends that it, it, it has produced gas up until at least 2017. Uh, this matters because of the two different manners in which Mr. Turner holds his interest. He gets paid one way for hail zone gas and paid another way for viola zone gas. That is my rudimentary way of explaining how the case works. Um, and his position is that, that the XTO has been paying him, has been calling all of the gas hail zone gas when the viola zone has been producing gas from the get-go and up through 2017. Now, here is how this case kind of got its genesis. Mr. Turner, who is, does not own the surface where this well sits in this particular, this particular well, happened to notice in late 2016 that the well was plumbed, or as he says, re-plumbed in such a fashion that the two zones could co-mingle by throwing a switch. And because Mr. Turner holds his interest in the well in two different manners, that's not supposed to happen under oil and gas, the oil and gas commission regulations. That triggered his interest. And so he measured, he metered the pressures on the two zones and discovered that they were equalized. He reported that to the Arkansas oil and gas commission and an investigation ensued, or a follow-up, I don't know that I would call it an investigation, but a follow-up ensued and XTO admitted that, yes, indeed, the two lines were presh, were equally pressurized and were capable of co-mingling and the well was shut in at that point. And that, that spurred Mr. Turner's further digging into the process. And he found records through to the past that indicated gas production from the Viola zone after 1982, since at least 1999. And so he brought this suit to, to recover for Viola zone production. And that was a, a hopefully coherent manner of explaining how we got here. As I said, the rub of the case is really whether the Viola zone is capable of producing gas. That was, that was what was, was briefed in summary judgment. And though the district court's ruling seems to turn on statute of limitations, the real issue is the, the quantum of proof that Mr. Turner produced to show that there was Viola zone production. And we have detailed that out in our briefing. The first thing is really, when I, when I went back and read my brief, I thought, well, for, for argument, oral argument purposes, it really pays, it really makes sense to start at the back end rather than the front end to demonstrate that the, the way that the well is plumbed and the equalized line pressures in 2016 and 2017 are really the first evidence that I would point to that would indicate Viola zone production. And then back from there, we can go back all the way to 1986 when we show a July of 1986 document, the last production in June of 1986 and not July of, and not 1982 as XTO contends, but that, that is not the only evidence as we've detailed in, in our briefing. And I, and I cut these into the brief because it seemed to be a little easier to follow that way. The, the documentary evidence beginning with pressure tests in 1996, 1997, and 1998 that show that the production is through the tubing zone, which is the Viola and not the casing zone, which is, which is the hail zone. And then from there, there was a spike in, in production in 1999. It doesn't have any other explanation to it, or has other possible explanations to it, but XTO's experts say they don't know what caused that. And then from there, production documents showing equalized line pressures beginning in 2001 through 2003. Now pausing here for a moment, the reason these equalized line pressures are important is because the pressures that are shown there are admittedly enough to produce gas from the hail zone. Therefore, an equalized pressure from the Viola zone would indicate a fact question on, on gas production during that period of time. The same sets of documents, by the way, show no water production, even though XTO's position is this well, quote unquote, watered out in 1982. And there's no indication of water production during that period of time. Then there were shut-in tests that we, we showed to you in our brief in October of 2001, showing gas production from the Viola zone or the tubing zone while the, while the casing zone was shut in, so that that production could not have been from the casing zone. And, and those same documents show no water, no barrels of water produced during that period of time. So all of that adds up to evidence that there was gas production in the Viola zone. I don't think anybody contends that the documents don't say those things. I think where the rub comes in in this case is XTO has produced experts who give explanations other than gas production for, for what could have caused these kinds of things. For example, going back to the 1996 through 98 documentary pressure tests, they found the person who did those pressure tests, who points out that there's other information contained on those forms that indicates that he was testing the Hale zone. Well, yes, that information is there. He also gives an affidavit in 2019 that he remembers in 1996, 97, and 98 that he was producing, he was testing the Hale zone. Now that, that is a good explanation. That is something that a fact finder could hear and decide that XTO is, is, is being tested during these periods of time. But that's just one explanation. It, it, it, it's, it's not the only thing that, that could explain flowing through tubing zone. The other thing that could be explained is that it could explain it as yes, indeed, the tubing zone was being tested and it showed as producing gas. The same thing with, with all of the other documentary. Mr. Brooks, question for you. I think I understand your argument. I guess my question would be, in this summary judgment record, what was before Judge Holmes that would vouch for your explanation? The documents themselves were before Judge Holmes to vouch for. Well, the documents, but do you, so you contend that those documents, a layman, someone without any expertise in oil and gas production and completion and operation of wells can understand those documents and explain what they mean? Yes. Well, you're talking about a problem with a sponsoring witness, which is something that has been on my mind since I began to look at this case. And the first response I have to that is there was never any contention by XTO below or holding by the trial court that the documents didn't, didn't show or mean what they say. The, the, the, the response was, we have another explanation for this. And so who the documents come in through was not an issue in the, in the district court with, they could, they could come in through XBO's own experts. They could come in through Bobby Morris. The observations of Mr. Turner in 2017 can come in through him and there's, there's, there doesn't seem to be any real question that equalized line pressures could, could without another explanation indicate gas flow. So that was never my, my best answer to what you're asking is how did we get this in and how did the jury understand it is it was taken as a given in, in this case. Now, would it have been nice to have an expert on the stand say, this is what this means, perhaps, and perhaps that could be done on remand, although the scheduling order has, has, has passed and then would have to be allowance to do it. But the documents themselves are the evidence of gas flow. And, and the 30B6 witness would be another way that these things could come in. There, there, there are other ways that it could be done, but the big problem that XTO would have with that at this point in time is it was never argued that the witness could not be introduced for what they assert in that regard. That makes sense. So that answered your question. I'm running quickly into my rebuttal time, but I will, I will say this, the documents say what they say, XTO's experts say they don't mean that. Those are other explanations. The way I could best understand this case is to flip it around. Had X, had Mr. Turner moved for summary judgment based on his observations and these documents, the way XTO could have avoided having summary judgment granted against it on the issue of this production would have been to produce the experts that they produced. It does, this is a classic fact question. This is what we had trials for in examining these witnesses before the fact finder. I'm down to two and a half minutes before my rebuttal time, into my rebuttal time. So if there are no further questions, I'll reserve the remainder of my time for rebuttal. Very well. You may. Thank you for your argument. Mr. Daly, we'll hear from you. Thank you, your honor. May it please the court. I am Thomas Daly and I'm representing XTO Energy aptly in this case. This case was but a few days from a scheduled bench trial when the district court granted a summary judgment on a motion that was filed about a month earlier. Had there been a trial, that same district judge would have heard the case as a bench trial. There would not have been a juror. The time for designating witnesses has long passed the discovery deadline. Likewise, what the district judge saw in connection with this summary judgment motion is precisely what he would see if there were to be a trial. According to the official production records of the Arkansas Oil and Gas they show clearly that the Viola zone last produced in October 1982 after producing, and this number is important, 42,793 cubic feet or thousand cubic feet, excuse me. The Hale zone continued. Why is the number important for those of us who don't know oil and gas? The number, as I will tell you in just a second. In fact, I'll tell you right now. The number is important because if we look at the one of the documents that Mr. Turner's counsel relies upon carefully, because you have to look carefully at these documents, not superficially. It's the chart that is at page 10 of the appellate's brief that the lay interpretation of Mr. Turner and his counsel, none of them are experts in this area, convinces them that the Viola zone produced. Now, if you look carefully at it, it will show the extent of the production from the Viola zone. That's that same number, 42,793 MCF. That's the number that was, according to the oil and gas commission, the cumulative production from the Viola zone when it ceased to produce in 1982. There's no argument, your honors, about the admissibility of these documents. These are documents which XTO inherited from previous operators and were in XTO's file. The issue here is it requires more than just a superficial reading of these documents to understand what they mean. And in many cases, most cases, it requires experts in the nature of geologists and reservoir engineers to understand what's going on several thousand feet below the earth. Mr. Turner is not an expert. Mr. Turner has named no experts to testify on his behalf in this case. And in fact, he candidly admitted in his deposition that he never talked to a geologist or an engineer for one minute about what he claims here. What we have here is the equivalent of the man on the street diagnosing my illness. It requires a great deal of education and experience to analyze data points created by not only this well, but wells in its immediate vicinity that are in pressure communication with this well to know what's going on. And what's going on simply is that the Viola zone filled with formation water sometime in 1982. When that happens, the well can no longer produce natural gas because it has, as we say in the business, watered out. At that point, it had produced exactly 42,973,000 cubic feet, and that is its total cumulative production to date. And essentially the documents cited by the appellant do not say what the appellant wants them to say. If we look at the three pressure tests, which are reproduced on, I think it's pages 9 and 10 of the appellant's brief, those are fill-in-the-blanks forms. They're forms that are issued by the Oil and Gas Commission to every operator of every well, and the operators are required to fill them in annually. And in each one of those years, 96, 97, and 98, I believe, by mistake, the forms said that the production was from the tubing zone. The mistake, however, is painfully obvious because in another blank, it identifies the producing zone as the hail formation. In still another zone, a blank, it identifies the producing interval as 8,500 through 8,578 feet below the surface. That is the hail zone. The viola zone is almost 500 feet deeper than that, separated from the two by impermeable rock. And then the well's name on those forms is the Turner 1C. There was a Turner 1T. That was the tubing zone. It ceased to report in 1982 because there was nothing to report. The gravamen of the motion for summary judgment is that you don't just throw any old thing up there and call it evidence and therefore prolong the agony. Rather, your evidence has got to be something which would lead a trier of fact, in this case, Judge Holmes, to the reasonable inference that your case should prevail. And it's just not there, Your Honors. It's just not there. Now, I want to talk for a minute also about the statute of limitations because that's the other reason, I suppose, the primary reason for Judge Holmes' ruling. And it's immaterial whether or not we are dealing with a statute of limitations which began with the occurrence or a statute of limitations within which every day is a repeat violation and therefore you have a moving window of limitations. The reason why it's immaterial is because every piece of evidence that begins to be of the level that Mr. Turner cited as supporting his position occurred way, way, way before the beginning of the three-year window, which would have been August 29, 2015. That's the reason why it doesn't matter whether Judge Holmes applied the three-year rolling window rule or the original occurrence rule because there's no evidence, zero evidence, even if you consider these items cited by the appellant to be evidence, there's zero evidence of any production from this viola zone that recently. It just doesn't exist. And Arkansas, and this is important, I think, Arkansas is not a discovery rule state on the statute of limitations. Arkansas applies the occurrence rule and the case, I think, that is most similar on that issue is one that was decided by this court in 1997 and that is the cited in the brief, the case of Deltic Timber versus Great Lakes Chemical. That case went to the court twice. This is the first occurrence which was on a summary judgment by Judge Barnes of the Western District of Arkansas who limited the proof of the then appellant to a three-year window. But the thing that went on appeal was Judge Barnes' ruling that the time prior to that was barred notwithstanding Deltic's claim that this wrong that was done to Deltic was underground and secret and therefore there's some special rules should apply that would cause the discovery rule as opposed to the occurrence rule to apply and Judge Barnes felt otherwise in this court agreed in an opinion at that time by Judge Morris Arnold. Your Honor, that's about all I came here to say. If there are questions, I'd be delighted to deal with them. Very well. You're not required to use all of your time and we appreciate the argument, Mr. Daly. Thank you. Mr. Brooks, we'll hear from you in rebuttal. Thank you. This is not hard to understand and takes no expertise. 1013 of 01, it shows the 188 MCF of gas produced with zero barrels of water in 24 hours, flow tubing pressure of 350 psi and shut in the casing pressure. That follows through each of those three consecutive dates. The gas was produced through the tubing zone, not through the casing zone in all of those three tests. So, these documents don't require that level of expertise to interpret them. Plus, as I've said, everyone agrees that the hail zone produced gas at these line pressures. Why is it not a logical inference a jury can draw that the viola zone with exactly the same pressures or greater pressures was producing gas as well, when the whole idea behind being watered out is that it overcomes the pressure in the line and there being no water produced to show that anything had watered out. Also, on this notion that the trial judge was going to hear the evidence. Mr. Brooks, just a quick question. What's your best case for the proposition that you just mentioned that would support your proposition that records of that nature, as you say, speak for themselves? When facing off with expert opinion evidence? Uh, I would have to give you a 28-J letter on that, Your Honor, because that was never an argument that was raised. There was never any inkling that these records didn't mean what they said. There were just other explanations for them. Not that the records can't be understood by a layperson. That was not something that the district court relied on or XTO argued below. So, that's not something that's been briefed. Should the court wish, I'll be happy to try to find a case and give you a 28-J letter. You mentioned that the jury could find something, but Mr. Daley says this was going to be a bench trial. What's the real story on that? Yeah, I misspoke. He is correct. The jury trial was not requested and was therefore waived. That doesn't mean that the trial court can exercise fact-finding at the summary judgment level before hearing evidence. That's a conceptually odd thing, which I've been in a situation I've been in before. But we still apply the summary judgment standard here. We haven't had any cross-examination of any of these witnesses. My time has passed. If there are no further questions, I'll ask that the trial court be reversed. I do have one. Is there any evidence in the record that shows that the Viola formation was capable of producing gas? Only the records that we have referred to that show production after XTO had said that production had ceased and the line pressures that we referred to, plus the switch with the commingling ability. Thank you. All right. Thank you for your argument. Thank you to both counsel. The case is submitted.